[Cite as *State v. Franks*, 2026-Ohio-1594.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio                                      Court of Appeals No.WD-25-015

      Appellee

                                Trial Court No. 2024CR0181

v.

Elizabeth Franks                                  **DECISION AND JUDGMENT**

      Appellant                      Decided: May 1, 2026

* * * * *

Paul A. Dobson, Wood County Prosecutor and
Kristofer Kristofferson, Assistant Prosecutor, for appellee.

David Klucas, for appellant.

* * * * *

**DUHART, J.**

{¶ 1} Appellant, Elizabeth Franks, appeals from a judgment entered by the Wood County Court of Common Pleas convicting her, following a jury trial, of operating a vehicle while under the influence of alcohol. For the reasons that follow, the trial court's judgment is affirmed in part, and reversed in part.

**Statement of the Case**

{¶ 2} On May 2, 2024, the Wood County grand jury returned a two-count indictment charging Franks with offenses related to a traffic accident that occurred on

December 12, 2023. Count 1 charged her with operating a vehicle under the influence of alcohol, a drug of abuse, or a combination of them ("OVI") under R.C. 4511.19(A)(1)(a) and R.C. 4511.19(G)(1)(d), as Franks had five prior convictions for OVI. Count 2 was also for OVI, but under R.C. 4511.19(A)(2)(a), R.C. 4511.19(A)(2)(b), and R.C. 4511.19(G)(1)(d), for her refusal to submit to chemical tests and for her prior OVI convictions. Both counts were felonies of the fourth degree, and both counts carried a repeat OVI offender specification under R.C. 2941.1413(A).

{¶ 3} Franks filed a motion to suppress wherein she alleged that: 1) the police lacked reasonable suspicion to request that Franks complete field sobriety tests; 2) the police lacked probable cause to arrest her for OVI; and 3) the police failed to substantially comply with the NHTSA manual when administering field sobriety tests. Regarding photographs of the scene that were initially thought by the parties to have been destroyed, she asserted that the State was obligated to show either that the photographs were destroyed prior to Franks's request or that the photographs were not materially exculpatory.

{¶ 4} An initial hearing on the motion to suppress was held on August 26, 2024. Following the hearing, the trial court took the matter under advisement. While the matter was still pending, the trial court indicated to counsel that it intended to deny the motion to suppress and issue an order to that effect. After that, but before the trial court's issuance of an order, the State digitally recovered the pictures that were previously thought to have been destroyed. The defense objected to any use of the pictures, while the State sought to supplement the evidence with them in connection with the motion to suppress.

2.

{¶ 5} On October 31, 2024, the trial court held a supplemental hearing to determine whether the photographs should be considered for purposes of the motion to suppress and, if so, to take testimony related to the pictures. Most of the photos depicted wreckage from the accident. Other photos depicted what appeared to be a water bottle, an unidentified can, an unopened Budweiser bottle, and a Bud Light can that may or may not have been opened. The State argued that the photos could be relevant to the question of whether the arresting officer had probable cause to conduct further investigation and probable cause to effect an OVI arrest. The defense argued that because the trial court had previously indicated its intention to deny the motion to suppress, Franks would suffer prejudice if the State were allowed to "retroactively bolster the evidence concerning probable cause."

{¶ 6} The trial court indicated that the pictures "give context to the accident and what was in the car" and that defense counsel would have the ability to cross-examine the arresting officer about whether he remembered the cans being at the scene and how the cans had weighed into the officer's considerations. The trial court, emphasizing that this was "a good faith situation," overruled the defense's objection.

{¶ 7} Thereafter, the trial court heard testimony from the arresting officer, who testified that the pictures were taken on the night of the crash and, further, were fair and accurate depictions of the scene. A second officer testified that the photos had been mistakenly believed to be lost because they were never transferred into the police department's new crash report system. He stated that they were ultimately retrieved after he found them in the department's old crash report system. Following this testimony, the

3.

trial court confirmed that the photos would be admitted for purposes of deciding the motion to suppress, "because the Court has to guarantee due process" and because the defense had demonstrated no apparent harm.

{¶ 8} On January 30, 2025, the trial court decided the motion to suppress, granting suppression of evidence of the administration and results of the horizontal gaze nystagmus test (because the test was not administered according to NHTSA standardized field sobriety testing manual requirements), but denying the rest of Franks's claims.

{¶ 9} The case proceeded to a two-day jury trial beginning on February 5, 2025, and ending on February 6, 2025. Franks was found guilty on both counts and specifications.

{¶ 10} The trial court merged the two counts for purposes of sentencing, and the State elected to proceed on Count 2 and its corresponding specification. Franks was sentenced to serve two years in prison on the specification and to five years of community control on the underlying OVI offense, to begin upon Franks's release from prison. As part of her community control, Franks was ordered to complete "any and all" requirements of the Intensive Supervision Program at SEARCH, a community-based correctional facility in Wood County. Franks's counsel objected to the SEARCH term, arguing that if a prison term is imposed on the OVI, there should be no local term of incarceration.

Appellant timely filed an appeal.

4.

**Statement of the Facts**

**Motion to Suppress – August 26, 2024 Hearing**

{¶ 11} Officer Tyler Dewitt of the Lake Township Police Department testified at the August 26, 2024 suppression hearing that he had specialized training in the detection of alcohol impairment, and that part of that training involved learning how to provide standardized field sobriety tests ("SFSTs") in compliance with the NHTSA safety manual. He testified that prior to December 12, 2023, he had performed standardized field sobriety testing around 20 to 25 times and that he had charged people with OVI a total of 13 times. He also mentioned that the Lake Township Police department did not utilize dash or body cameras, and so his interaction with Franks would not have been recorded on the night in question.

{¶ 12} Regarding the night in question, Dewitt testified that on December 12, 2023, at around 1:30 a.m., he was on patrol on I-280 northbound, near the section of the roadway where I-280 southbound becomes State Route 420. He was stationed on the shoulder, watching oncoming traffic coming from I-90, i.e., the turnpike, when he heard a loud crashing sound. He turned and saw that a silver Dodge SUV had crossed several lanes of travel and struck a nearby guardrail. Dewitt then watched the silver SUV as it first moved into reverse and then began traveling southbound on State Route 420. Dewitt stated that he soon located the silver SUV, disabled and smoking, on the shoulder of the road. He noted that the car had heavy front-end damage, a back passenger tire that was completely flat, and a rear window that was "busted out."

5.

{¶ 13} Dewitt testified that due to the smoke coming from the vehicle, his immediate priority and concern was to get the occupant out for safety reasons. He testified that a can fell out of the car as Franks exited the vehicle, and that she stumbled and almost fell "face first" on the roadside as she attempted to retrieve it. Dewitt described that Franks was "unsteady on her feet" and "stumbling," and that she started to wander in the wrong direction as they were going back to his car.

{¶ 14} Dewitt testified that he asked Franks whether she had been drinking and she answered no. She stated that she was coming from home, and when asked where she was going, she again stated "home." When Dewitt asked her if she struck the guardrail, she answered that she just wanted to go home.

{¶ 15} Dewitt testified that he placed her in his patrol car due to the cold temperatures. While speaking to her, he noticed that she had "glossy red eyes," "[h]er speech was slurred," and she was not always forming complete and coherent sentences. Dewitt testified that based on his training to detect alcohol impairment, the bloodshot, glossy eyes, and the slurred speech conveyed to him that she was impaired.

{¶ 16} When he asked Franks how the crash occurred, she answered that there were no speed limit signs visible on the curve exit ramp, and that not seeing those, speed was a factor. Dewitt testified that she would have to have crossed two southbound lanes in order to have driven into the guardrail. He stated that from his experience in dealing with impaired drivers, marked lanes violations are the most common infraction that impaired drivers make.

6.

{¶ 17} Dewitt stated that throughout his interaction with Franks, she repeatedly stated that she just wanted to go home and that she did not know why he was doing this to her. Following his discussion with Franks, Dewitt decided to perform SFST testing on her.

{¶ 18} Dewitt agreed that the factors he considered when deciding to perform SFST testing included: 1) the fact that there was a crash; 2) the marked lanes violation; 3) Franks's bloodshot, glassy eyes; 4) her incomplete sentences; 5) her slurred speech; 6) her demeanor; 7) her lack of coordination or balance; and 8) that it was approximately 1:30 a.m.

{¶ 19} Dewitt described how he first performed the nystagmus test, the walk-and-turn test, and, finally, the one-leg stand test. He stated that prior to administering the first test, he asked Franks if she had any health ailments that would prohibit her from walking in a straight line. Franks answered that she did not.

{¶ 20} He described how Franks had performed poorly on the walk-and-turn test, first by starting the test numerous times before she was instructed to do so, and then by holding her arms out straight for balance, rather than at her sides, with four inches between steps, instead of heel-to-toe, and her steps not in a straight line. Dewitt testified that because Franks "was falling" after taking just four steps, the test was concluded for safety reasons. According to Dewitt, Franks stated to him while he was attempting to demonstrate the test, "I hate you and I don't know why you're doing this to me."

{¶ 21} Next, Dewitt described his administration of the one-leg stand test, and how Franks fared poorly because she needed to use her arms for balance and because she

7.

ended the test after only a few seconds -- rather than after the required 30 seconds -- by placing her raised foot on the ground. In addition, rather than counting during the test, as she was instructed, Franks merely muttered something unintelligible under her breath.

{¶ 22} Based on the SFST test results together with the factors that led to his decision to administer the tests, Dewitt determined that Franks was under the influence.

{¶ 23} Dewitt admitted on cross examination that he never detected any odor of alcohol at any point during his encounter with Franks. He also acknowledged that bloodshot, glassy eyes at night could indicate driver fatigue, that Franks could have had a medical issue that affected her speech, and that nervousness or having recently been in a car crash could likewise impact a person's speech. Also on cross examination, Dewitt testified in detail as to how he had conducted the nystagmus test.

{¶ 24} In response to examination by the trial court, Dewitt answered that he had observed no injury on Franks.

**Trial**

**Officer Dewitt**

{¶ 25} At trial, Dewitt testified as to how on December 12, 2023, he heard a crash and saw a silver gray SUV in the southbound lanes of 420 that looked like it had struck a guardrail. He further testified as to how the vehicle did not remain at the scene of the crash but instead began to travel southbound on 280/420, and that he ultimately came to find the vehicle, apparently disabled, on the shoulder of the roadway, with heavy front end damage and smoke emanating from the hood, with a flat tire, and the driver's side

8.

rear window blown out. Dewitt identified photographs that depicted the damage to the vehicle.

{¶ 26} Next, Dewitt described how a can fell out when the driver's door was opened and that when Franks attempted to step out, "she almost fell face-first forward," in what she stated was an attempt to retrieve the can. Dewitt testified that when he asked her where she was traveling, she answered home, and that when he asked her where she had come from, she again answered home.

{¶ 27} According to Dewitt, as he was talking to her, she repeatedly stated, "I just want to go home." He asked Franks whether she had been drinking or taking any medication and she stated that she had not. He stated that her speech was slurred and she was not making much sense, giving him short, one-word answers to his questions. When he asked her if she knew she had hit the guardrail further back on the road, she answered in the affirmative, explaining that as she was exiting the turnpike, she was going too fast (as there were no speed limit signs), causing her to lose control of the vehicle and jump over two lanes before striking the guardrail. At no point during the conversation did she indicate why she left the area and attempted to travel with the vehicle in its damaged condition.

{¶ 28} Throughout the interaction with Dewitt, Franks continued to repeat that she just wanted to go home. Dewitt testified that as a result of his professional training he is able to identify signs of drivers who are impaired by drugs or alcohol. He stated that based on his training, education, and experience, glossy eyes and slurred speech are indicative of being under the influence or "impaired to operate a motor vehicle."

9.

{¶ 29} Dewitt testified that as he attempted to walk Franks to the front of his patrol car, Franks, who was "[v]ery unsteady on her feet," wandered off in the wrong direction before being directed back.

{¶ 30} Dewitt testified that based upon what he had seen, he decided to administer SFSTs, but before doing so he asked Franks whether she had any medical ailments that would prevent her from walking in a straight line. Franks stated that she did not. Nor did she state that she needed to get her glasses.

{¶ 31} Dewitt testified that he tried to administer the walk-and-turn test, but that Franks "began the test prematurely numerous times." He also stated that she kept talking while he was explaining the test -- saying that she hated him and did not understand why he was doing this to her -- and that she could not balance well enough to hold one foot in front of the other. Instead of touching heel-to-toe, her feet were four inches apart, and instead of keeping her arms to her sides, she kept using her arms for balance "kind of like an airplane." Dewitt stated that with each step, Franks was almost falling, face first, into traffic. After four steps, Dewitt concluded the test for safety reasons, because they were "on a somewhat busy road."

{¶ 32} Dewitt testified that he also administered the one-legged stand test. Again, Dewitt stated that Franks used her arms for balance, rather than placing them by her side. In addition, she lifted her foot up for two seconds and then placed it back down, the whole time using her arms for balance. She tried to restart the test, "but quit before she even lifted her foot off the ground." Her demeanor while attempting to complete the test

10.

included her mumbling something under her breath towards Dewitt. At this point, Franks was placed in handcuffs and arrested for OVI.

{¶ 33} Next, Franks was taken to the police station for a breathalyzer test. On the way, she stated numerous times that she did not want to be in handcuffs, telling Dewitt "[i]t's not like I'm going to kill you." Dewitt testified that upon arriving on the scene, he presented Franks with a BMV-2255 form that explained the punishments for refusing to take the breathalyzer test. He stated that they went over the form together and that she subsequently signed it. He also testified that she refused to take the test.

{¶ 34} Dewitt identified photographs depicting an unopened beer bottle and a Bud Ice 25-fluid ounce beer can that were found inside Franks's vehicle. Dewitt explained that it could not be determined from the photos whether the beer can was opened or unopened. In addition, he identified a Red Bull can as the can that Franks had previously reached for.

{¶ 35} On cross examination, defense counsel questioned Dewitt extensively about his failure to detect the odor of alcohol at any point during his encounter with Franks. In addition, Dewitt acknowledged that someone could have bloodshot eyes due to tiredness or allergies, or even contact lens irritation.

{¶ 36} On redirect, Dewitt reiterated that there were numerous factors that he considered in deciding to arrest Franks for OVI, and that "glossy eyes" was but one factor.

11.

**Officer John Eggleston**

{¶ 37} Officer John Eggleston of the Lake Township Police Department testified that he responded to the scene to assist Dewitt. He stated that he went to inspect the guardrail just north of the turnpike and found it "completely bent about 90 degrees-ish," with debris all over the roadway and a fluid trail that led from where the guardrail was bent "down south on the highway." He further testified that there were tire marks on the road leading to where the guardrail was hit that were consistent with skidding or braking.

{¶ 38} Eggleston stated that he photographed Franks's vehicle and observed the walk-and-turn-test as it was being administered to Franks. He described the crash as "significant," and observed that Dewitt had to stop the test because Franks was losing her balance and was starting to fall close to the lane of travel. Eggleston stated that after the arrest, he did a records check for Franks and found that she had five previous convictions for OVI within the last 20 years.

{¶ 39} On cross examination, defense counsel pointed out that Eggleston had prepared a crash report indicating that alcohol was suspected. Eggleston affirmed that his understanding when filling out the form was that alcohol consumption, and not drug use, was suspected in this case. He acknowledged that while a search warrant to test Franks's blood or urine could have been requested, it was not.

### Assignments of Error

{¶ 40} On appeal, Franks asserts the following assignments of error:

I.     The trial court committed reversible error by denying appellant's motion to suppress.

12.

II.     The trial court committed reversible error by denying appellant's Criminal Rule 29 motions.

III.    The verdicts are against the weight of the evidence.

IV.     The trial court committed reversible error by imposing an indefinite term in a community based corrections facility after appellant served a mandatory prison term.

## Law and Analysis

**First Assignment of Error**

{¶ 41} Franks argues in her first assignment of error that the trial court committed reversible error by denying her motion to suppress, first, because there was no reasonable suspicion to request field sobriety tests and, second, because the arresting officer lacked probable cause to arrest her.[1]

---

[1] Without citing any case law, Franks begins her argument by stating that in reviewing the trial court's decision on the motion to suppress, this court should limit its consideration to the evidence produced at the August 26, 2024 hearing. As a basis for this argument, Franks states only that "[b]efore the court reopened the hearing on 31 October 2024, [the trial court] had informed counsel that the motion was going to be denied."

The question of whether to accept additional evidence for purposes of a suppression hearing is within the sound discretion of the trial court. *See State v. Callihan*, 80 Ohio App.3d 184, 195 (4th Dist. 1992); *see also State v. Bracey*, 2025-Ohio-2133, ¶ 58 (6th Dist.), citing *State v. Lashuay*, 2007- Ohio-6365, ¶ 19 (6th Dist.) ("The standard of review regarding the trial court's denial of reopening is abuse of discretion."). In *Lashuay*, this court held that a trial court *abused its discretion* in *refusing to reopen* the suppression hearing to review and consider new evidence that bore directly on the propriety of the stop. *Id.* at ¶ 20. The court explained that "[f]ailure to consider the new evidence denied [the] appellant a full and fair opportunity to present his case." *Id.*

Especially in this case, where the trial court reopened the evidence before issuing a judgment entry ruling upon the motion to suppress, we find no abuse of discretion in the trial court's decision to reopen the evidence. *See Callihan* at 195 (trial court's decision to

13.

{¶ 42} Appellate review of a motion to suppress involves a mixed question of law and fact. *State v. Dye*, 2021-Ohio-3513, ¶ 36 (6th Dist.), citing *State v. Burnside*, 2003-Ohio-5372, ¶ 8. "The trial court acts as the trier of fact at a suppression hearing by weighing the evidence and determining the credibility of the witnesses." *Dye* at *id*. "Although we must accept any findings of fact that are supported by competent, credible evidence, we conduct a de novo review to determine whether the facts satisfy the applicable legal standard, and this independent review is done without deference to the trial court. *Id.* citing *State v. Codeluppi*, 2014-Ohio-1574, ¶ 7, (6th Dist.), citing *Burnside* at ¶ 8; *State v. Jones-Bateman*, 2013-Ohio-4739, ¶ 9 (6th Dist.).

{¶ 43} Regarding reasonable suspicion in an OVI case, "'an officer may request a motorist to perform field sobriety tests after a traffic stop…where the officer has articulable facts that give rise to a reasonable suspicion that the motorist is intoxicated.'" *State v. Colby*, 2021-Ohio-4405, ¶ 17 (6th Dist.), quoting *Cleveland v. Hyppolite*, 2016-Ohio-7399, ¶ 29 (8th Dist.).

{¶ 44} "Ohio courts recognize that a number of factors may supply an officer with reasonable suspicion to conduct field sobriety tests, including, but not limited to (1) the time of day that the stop occurred; (2) the area where the stop occurred; (3) whether there was erratic driving that might point to a lack of coordination; (4) the existence of a "cognizable report" that the driver might be intoxicated; (5) the appearance of the suspect's eyes;[] (6) impairments related to the individual's speech; (7) an odor of alcohol

reopen evidence prior to issuing judgment entry sustaining motion to suppress was not unreasonable, arbitrary, or unconscionable).

in the car or on the person; (8) the strength of that odor; (9) lack of coordination after the stop; (10) "the suspect's demeanor"; and (11) the suspect's admission of alcohol consumption." *Dye* at ¶ 65, citing *State v. Evans*, 127 Ohio App.3d 56, 63, (11th Dist.1998), fn. 2; *see also State v. Martorana*, 2023-Ohio-662, ¶ 27, citing *Evans* at fn.2. "In determining whether the officer had reasonable suspicion we look at the totality of the circumstances, not any one factor." *Dye* at *id.*, citing *State v. Andrews*, 57 Ohio St.3d 86, 87, (1991);

{¶ 45} "To determine whether an officer had probable cause to arrest a driver for OVI, a reviewing court must consider whether, at the time of the arrest, 'the police had sufficient information, derived from a reasonably trustworthy source of facts and circumstances, sufficient to cause a prudent person to believe that the suspect was driving under the influence.'" *Dye* at ¶ 83, quoting *State v. Homan*, 89 Ohio St.3d 421, 427 (2000). (Additional citations omitted). "In making this determination, the reviewing court must consider the totality of the circumstances surrounding the arrest." *Id.* "Probable cause to arrest does not have to be based, in whole or part, on the results of field sobriety tests." *Dye* at *id.,* quoting *State v. Masin*, 2020-Ohio-6780, ¶ 34 (6th Dist.), citing *Homan* at 427.

{¶ 46} "'Examples of circumstances that may support or undermine probable cause in an OVI case include the manner of driving, the day and time, the driver's appearance and ability to communicate, including glassy and bloodshot eyes and slurred speech, the driver's behavior and cooperation, the driver's coordination and balance, the smell of alcohol, the presence of alcohol containers in the vehicle, the admission of

15.

drinking alcohol or other incriminating statements, and the driver's performance on field sobriety tests.'" (Citations omitted.) *State v. Scott,* 2022-Ohio-2071, ¶ 40 (6th Dist.), quoting *State v. Baah*, 2016-Ohio-7131, ¶ 21-22 (10th Dist.).

**A. Officer Dewitt's request that Franks submit to SFSTs was supported by reasonable suspicion.**

{¶ 47} In arguing that Dewitt lacked reasonable suspicion to request Franks to submit to SFSTs, Franks contends that Dewitt was an unreliable witness because he had only administered field sobriety tests 20-25 times and that the trial court failed to appreciate that Franks had just been in a single-vehicle accident. Further, Franks states that not enough of the *Evans* factors were present to justify requesting Franks to submit to SFSTs.

{¶ 48} We find that the trial court's factual findings concerning the reliability of Dewitt's testimony are supported by competent, credible evidence. Dewitt testified at length as to the many reasons he believed Franks to be intoxicated prior to initiating the field sobriety testing. While he made some mistakes on the horizontal gaze nystagmus test that led it to be suppressed, he performed the other SFSTs without issue and recounted all significant details of his interaction with Franks, many of which pointed to her being under the influence of alcohol. And while Dewitt may not have arrested a great number of impaired drivers or conducted a great number OVI investigations, his testimony was sufficient to allow a trial court to conclude that his opinions and observations were credible.

16.

{¶ 49} As to the significance of the crash, we note that despite the severity of the damage to Franks's vehicle and to the guardrail that she hit, Dewitt saw no visible injuries on Franks and -- perhaps even more importantly -- Franks denied being injured. Although the trial court was free to find the accident to be the cause for certain aspects of Franks's condition, it was not required to do so.

{¶ 50} Finally, Dewitt's request that Franks complete SFSTs was entirely justified by the *Evans* factors. The traffic stop occurred at 1:30 in the morning, after Franks had gotten herself into a single-vehicle crash that involved her crossing multiple lanes of travel, slamming into a guardrail, and then fleeing the scene with disabling damage to her vehicle. Her demeanor was such that she stumbled out of the car, nearly falling face-first into the road while attempting to retrieve a can that had fallen out. She continued to stumble around after exiting the vehicle, and she stated to Dewitt regarding her travels that she was both going home and coming from home. Lastly, her speech was slurred, she was unable to form complete sentences, and she had glossy, red eyes.

{¶ 51} While it is not insignificant that Dewitt did not detect the smell of alcohol and that Franks did not admit to consuming alcohol on that evening, these facts are not necessarily fatal to a finding of reasonable suspicion. *See State v. Rice*, 2017-Ohio-9114, ¶ 30 (1st Dist.) ("there is no requirement that an officer smell alcohol or drugs on or about the person, find an open container of alcohol, or obtain an admission of consumption"). We find that the circumstances of this case provided ample articulable facts giving rise to a reasonable suspicion that Franks was intoxicated, strongly

17.

supporting Dewitt's decision to conduct field sobriety testing even absent the odor of alcohol.

**B. Franks's arrest was supported by probable cause after Franks's failure on SFSTs and given other factors.**

{¶ 52} In addition to all of the reasons justifying Dewitt's request that Franks submit to field sobriety testing, Franks's poor performance on the walk-and-turn and one-legged stand tests further justified her arrest, as did her belligerent behavior during the walk-and-turn test, when Franks told Dewitt that she hated him. We find that given the totality of the circumstances, Dewitt had sufficient information to cause a prudent person to believe that Franks was driving under the influence and, therefore, he had probable cause to arrest her for OVI.

{¶ 53} For the foregoing reasons, Franks's first assignment of error is found not well-taken.

**Second and Third Assignments of Error**

{¶ 54} Franks's second and third assignments of error involve arguments related to the weight and sufficiency of the evidence. Because these concepts are closely related, they will be addressed together.

{¶ 55} Franks initially contends that the trial court erred in denying her Crim.R. 29 motion for acquittal. "The standard of review for a denial of a Crim.R. 29 motion is the same as the standard of review for sufficiency of the evidence." *State v. Johnson*, 2014-Ohio-2435, ¶ 11 (6th Dist.), citing *State v. Carter*, 72 Ohio St.3d 545 (1995). When reviewing the sufficiency of the evidence, our function is to examine the trial evidence to

18.

determine "whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, fn. 4 (1997).

{¶ 56} "While sufficiency of the evidence examines whether the evidence is legally sufficient to support the verdict as a matter of law, the criminal manifest weight of the evidence standard addresses the evidence's effect of inducing belief." *State v. Herrera*, 2022-Ohio-4769, ¶ 37 (6th Dist.), citing *State v. Wilson,* 2007-Ohio-2202, ¶ 25, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386.

{¶ 57} In determining whether Jackson's conviction is against the manifest weight of the evidence, we must review the record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and decide, in resolving any conflicts in the evidence, whether the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Prescott*, 2010-Ohio-6048, ¶ 48 (6th Dist.), citing *Thompkins* at 387. We do not view the evidence in a light most favorable to the State; rather, we "sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Lewis*, 2022-Ohio-4421, ¶ 22 (6th Dist.), quoting *State v. Robinson*, 2012-Ohio-6068, ¶ 15 (6th Dist.), citing *Thompkins* at 388. "Although we consider the credibility of witnesses under

19.

a manifest-weight standard, we must, nonetheless, extend special deference to the fact-finder's credibility determinations, given that it is the finder of fact that has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor." *State v. Brooks*, 2023-Ohio-2978, ¶ 13 (6th Dist.), citing *State v. Fell*, 2012-Ohio-616, ¶ 14 (6th Dist.).

{¶ 58} Only in "the exceptional case in which the evidence weighs heavily against the conviction" is a conviction reversed on manifest weight grounds. *Brooks* at ¶ 12, quoting *Thompkins* at 387.

{¶ 59} In this case, there was substantial evidence that Franks was operating a vehicle under the influence of alcohol. She got herself into a serious vehicle disabling crash that involved her crossing multiple lanes of travel and slamming into a guardrail. In spite of the damage to her car, she immediately fled the scene of the accident. When she did finally exit her vehicle, she stumbled out and nearly fell. She could not articulate the path of her travels and she repeated certain statements to Dewitt multiple times. Her speech was slurred and she did not make sense. She wandered without direction and stumbled while being instructed to walk over to Dewitt's vehicle. She performed poorly on SFSTs, and she became combative and derogatory with Dewitt. Finally, she had alcohol containers in the car, and she refused the breathalyzer test. All of these circumstances are consistent with alcohol consumption. That certain of Franks's behaviors could also be attributed to having been in a car crash -- or some other reason -- is of no consequence here, because a determination as to the sufficiency of the evidence

20.

requires that we view the evidence in a light most favorable to the State. While Franks argues that "[a]lcohol consumed recently enough to impair driving is detectable by smell," the record contains testimony by Dewitt wherein he expressly states that "[v]odka basically has no smell."

{¶ 60} We further find that this is not the exceptional case in which the evidence weighs heavily against the conviction. Accordingly, we decline to reverse Franks's conviction on either sufficiency of the evidence or manifest weight grounds. Franks's second and third assignments of error are therefore found not well-taken.

**Fourth Assignment of Error**

{¶ 61} Franks claims in her fourth assignment of error that the trial court committed reversible error by imposing an indefinite term at the SEARCH community-based correctional treatment facility, where that term was ordered to be served after Franks serves her mandatory two-year prison sentence for the R.C. 2941.1413 specification.

{¶ 62} Here, the trial court sentenced Franks to five years of community control on the underlying OVI offense to begin after she serves her mandatory prison sentence. Along with standard and expected conditions of community control, the trial court imposed the following condition:

> Defendant shall enter into and successfully complete the SEARCH Program. Defendant shall follow any and all recommendations for aftercare. Once Defendant is released from the Ohio Department of Rehabilitation and Corrections, Defendant shall be remanded to the custody of the Wood County Sheriff until a bed becomes available for entry into

21.

SEARCH. Defendant shall report to the Wood County Adult Probation Department within seventy-two hours of release from SEARCH.

{¶ 63} Under R.C. 2929.16(A)(1), the trial court had the ability to impose "a term of up to six months at a community-based correctional facility" as a condition of Franks's community control. Instead, the trial court imposed an indefinite term at the SEARCH program, with no limitation on Franks's custodial time other than successful completion of the program. This is error. Because Franks's time at SEARCH cannot lawfully exceed six months, Franks's fourth assignment of error is found well-taken. The matter will be remanded to the trial court for resentencing in conformity with R.C. 2929.16(A)(1).

**Conclusion**

{¶ 64} The judgment of the Wood County Court of Common Pleas is affirmed in part, and reversed in part. The matter is ordered remanded to the trial court for resentencing consistent with this opinion. Appellant and appellee are ordered to divide the costs of appeal pursuant to App.R. 24.

Judgment is affirmed in part and reversed in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See also 6th Dist.Loc.App.R. 4.

22.

Thomas J. Osowik, P.J.
_____

_____
JUDGE

Christine E. Mayle, J.
_____

_____
JUDGE

Myron C. Duhart, J.
_____
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.

23.